# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA

_____

| | | |
|---|---|---|
| JOHN DOE and JANE DOE, individually and on behalf of their minor daughter, NANCY DOE, | : : : : | |
| | : | 4:16-cv-00521 |
| *Plaintiffs*, | : : | |
| | : | MEMORANDUM IN SUPPORT OF |
| v. | : : | MOTION FOR TEMPORARY RESTRAINING ORDER |
| ED BULL, in his official capacity as County Attorney of Marion County, Iowa, | : : : : | |
| *Defendant*. | : : | |

_____

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

### I. Facts

In March of 2016, a "sexting scandal erupted at Knoxville High School in Marion County." School officials uncovered the fact that some of the teenage male students at the school had been trading amongst themselves photographs of some of the teenage girl students. After discovering this information and alerting parents to the potential problem, school officials turned over the information to the Knoxville Police Department to begin an investigation.

One of the students implicated was Nancy Doe, a then 14-year-old freshman at the school. Nancy had taken two photographs of herself in her bedroom mirror

and sent them through Snapchat to M.E., another student at the school. M.E. had asked Nancy to send him the photos. Nancy soon discovered that M.E. had disseminated the photographs by group text to other students at the school.

The first photograph of Nancy Doe shows her standing and reflected in her bedroom mirror wearing boy short underwear (similar to male boxer briefs) and a sports bra. The second photograph, shows Nancy wearing the same boy shorts but with her hair entirely covering her breasts rather than the sports bra.

Nancy's mother, Jane Doe, was alerted by the school that there was a potential problem with Nancy and some "inappropriate" photographs. The school did not show Jane the photos nor describe them in any way other than inappropriate. School officials told Jane that she and her husband would be contacted by the Knoxville Police Department who were conducting an investigation.

Jane and John Doe quickly called a family meeting with their daughter and asked her about what the school had told Jane. Nancy admitted to sending some photographs to M.E. and described the photos to her parents. Hearing the photos described, the Does felt confused that anyone had accused their daughter of engaging in unlawful behavior. The Does confiscated Nancy's phone until they could glean further information as to what the true extent of the issue was.

Knoxville Police Investigators met with the Does and showed them two photographs of Nancy in an attempt to have them verify her identity. The Does did identify their daughter in the photos and learned that the photos were exactly as Nancy had described them. When they asked investigators why they were there for these photos, investigators said that there were other students implicated and that investigators and the County Attorney, Ed Bull, were more interested in those other students. Investigators told them they should not have anything to worry about.

Several weeks later on April 27, 2016, the Does received a letter that informed them that a complaint about Nancy had been made to Juvenile Court Services by the Knoxville Police Department and that the alleged violation was Sexual Exploitation of a Minor. The letter requested that Nancy and a parent or parents appear for an intake interview on May 24, 2016. The Does were shocked that their daughter was being accused of Sexual Exploitation of a Minor, especially in light of the pictures they had seen, and that had serious reservations that any interview/meeting would change their mind about that.

As it turns out, the Does were unable to attend the May 24th meeting. The Does were told that Defendant Bull was present for that meeting in which at least 30 other students were present. Apparently, a roll call or other mechanism for attendance was employed and it was made clear that Nancy Doe and her family

were not in attendance. Defendant Bull informed the students that they could be charged with a crime that could land them on the sex registry. Defendant Bull told the students, however, that they could avoid charges and the registry by taking part in a pre-trial diversion program which included the requirements that they engage in community service, complete a re-education class on the consequences of "sexting," give up their laptops and cellphones for an unspecified period of time and give Juvenile Court Services a confession of their conduct.

John Doe met with Kristi Dotson of Juvenile Court Services the next day. John asked Ms. Dotson if she had viewed the pictures of her daughter in question. Ms. Dotson admitted that she had not viewed the photos. John Doe was frustrated as to why his daughter was being threatened with criminal charges for pictures that no one seemed to have viewed. Dotson informed John that she was just conducting intake interviews and that she would check with Defendant Bull about the photos. Dotson informed John that he and Nancy needed to appear for an interview at which she would have answers to John's questions.

On May 27, 2016, John and Nancy appeared for an interview with another Juvenile Court Services officer who likewise informed John Doe that he had not viewed the photos but that it did not matter because Defendant Bull would be charging Nancy if she did agree to the diversion program. John ended the

4

interview. The JCS Officer told John that Nancy had until June 2, 2016, to decide about the program or she would be charged.

At this point, the Does realized they needed legal counsel and they hired Matthew Lindholm to represent Nancy. Lindholm attempted to explain to Defendant Bull that Nancy was engaging in speech and conduct that was protected by the First Amendment but Defendant Bull was unmoved. Bull continued to insist that if Nancy did not agree to the diversion program, he would charge her. In an email to Lindholm on June 15, 2016, Bull gave Nancy and her parents until the following week to decide or he would charge.

Nothing more was heard from Defendant Bull until Tuesday, September 20, 2016, when Bull again told Lindholm that if Nancy did not agree, he was charging her. The Does now file this declaratory and injunctive relief action seeking to redress their grievances.

Plaintiffs also incorporate the facts of the Complaint (Doc. No. 1) in this matter as well as the Affidavit of Jane Doe (attached herein as Exhibit A).

## II. Argument

### A. Standard for Temporary Restraining Order.

In considering whether to issue a preliminary injunction, the Court must determine: (a) whether the plaintiff is likely to prevail on the merits, (b) if there exists a threat of irreparable harm to the plaintiffs absent the injunction, (c) the

balance between this harm and the injury that the injunction's issuance would inflict upon defendant, and (d) what is in the public interest. Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981). The standard for a temporary restraining order is the same as the standard for a preliminary injunction. Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367 (8th Cir. 1991).

**B.     Plaintiffs Are Likely to Succeed on the Merits of Their Constitutional Claims.**

The burden is on Defendant to demonstrate that the practice of a teenage girl taking non-obscene and non-nude photos of herself and sending them to another teenager is conduct that is not protected by the First Amendment and is conduct subjecting the teenager to child pornography and/or sexual exploitation of a minor charges.[1] This case involves a practice, not a statute. But even where a statute exists that allegedly regulates the exercise of First Amendment rights, the burden is on the statute's proponent to establish the statute's constitutionality. Phelps-Roper v. Koster, 713 F.3d 942, 949 (8th Cir. 2013).

---

[1] Plaintiffs request for a Temporary Restraining Order under these facts is not unprecedented. The Third Circuit upheld a similar TRO and PI issued against a prosecutor for attempting to force a minor accused of "sexting" to attend a re-education class when both the minor and her parents objected to such attempts. See Miller, et al. v. Mitchell, 598 F.3d 139 (3d. Cir. 2010).

6

Because the challenged practice restricts First Amendment activity means that consideration of the likelihood of success on the merits is decisive to the question of whether an injunction should issue. "In a First Amendment case, ... the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." Phelps–Roper v. Nixon, 545 F.3d 685, 690 (8th Cir. 2008), overruled on other grounds by Phelps–Roper v. City of Manchester, Mo., 697 F.3d 678 (8th Cir. 2012). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (quoting Phelps–Roper v. Troutman, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam) (quotation omitted).

The Plaintiffs are being compelled–through an express threat of a prosecution that clearly lacks any basis–to participate in a "re-education" program with which they disagree. Retaliation exists here because (1) their minor daughter has a constitutional right to avoid the re-education program and her parents have a constitutional right to direct her education; (2) prosecution of Nancy Doe would be retaliation (an adverse action); and (3) because Nancy Doe's pictures were not illegal. The only reason to prosecute her would be in retaliation for exercising her and her parent's constitutional right not to participate in the program.

7

John and Jane Doe have a Fourteenth Amendment right substantive due process right "to be free from state interference with family relations." <u>Gruenke v. Seip</u>, 225 F.3d 290, 303 (3d Cir. 2000). "Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." <u>M.L.B. v. S.L.J.</u>, 519 U.S. 102, 117 (1996) (quoting <u>Boddie v. Connecticut</u>, 401 U.S. 371, 376 (1971)). Indeed, "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. <u>Troxel v. Granville</u>, 530 U.S. 57, 65 (2000). As early as 1923, the Supreme Court found that "the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.'" <u>Id.</u> (quoting <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399 (1923)).

Plaintiff John and Jane Doe do not want their daughter to attend the Defendant's re-education program. They object to a requirement that their daughter write a statement describing what she did wrong. Their daughter "was the victim" of whoever sent out the photographs. Since their daughter has done "nothing wrong," she should not have to write such a statement. They believe such a program would be stigmatizing and harmful to their daughter.

This program violates the parent's right to direct their children's education. Nancy Doe has asserted her right to be free from compelled speech. "'Since *all* speech inherently involves choices of what to say and what to leave unsaid,' one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 573 (1995) (quoting Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal., 475 U.S. 1, 11 (1986)). Thus, "[t]he Supreme Court has long recognized that, in addition to restricting suppression of speech, the First Amendment may prevent the government from . . . compelling individuals to express certain views.' United States v. United Foods, Inc., 533 U.S. 405, 410 (2001)). This view exists because "'[a]t the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration and adherence.' Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994)). Among the categories of compelled speech found impermissible by the supreme court "is government action that forces a private speaker to propagate a particular message chosen by the government." Id.  Here, Nancy Doe will be compelled to write an essay that explains what she did wrong. Because she in no way violated the law, being compelled to describe her behavior as wrong on threat of an aggravated

misdemeanor sexual exploitation conviction forces her to express a belief she does not hold and thus violates her right to be free of compelled speech.

"[A]s a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Hartman v. Moore, 547 U.S. 250, 256 (2006). Thus, the Plaintiffs' claim that the threat of a criminal prosecution would deter an ordinary person from exercising their constitutional rights meets the "reasonable likelihood of success on the merits" standard for a temporary restraining order to be issued by this Court.

In addition, the images in question here could not possibly support a charge of sexual exploitation of a minor, child pornography or any other charge under Iowa law. As such, the defendant's threat to charge the minor plaintiff with an aggravated misdemeanor is not a genuine attempt to enforce the law, but instead an attempt to force the minor plaintiff to participate in the re-education program. The fact that the defendant continues to promise prosecution if the girl refuses to participate indicates that the charges are retaliation for her refusal to engage in compelled speech. In the case of the parents, this threat is an attempt to compel them to abandon their Fourteenth Amendment right to control their child's upbringing.

The Defendant has no basis in Iowa law for prosecuting Nancy Doe. Defendant has asserted that the photographs in question of Nancy Doe are sufficiently "nude" or "explicit" to allow the Defendant to charge Nancy with Sexual Exploitation of a minor under Iowa Code Section 728.12(1). Disregarding the extremely troubling scenario that the Defendant is trying to charge a "victim," Sexual Exploitation of a Minor requires that an individual induce, entice, cause or attempt to cause a minor to engage in a prohibited sexual act or simulation of a prohibited sex act. Nothing about the photos in questions comes close to meeting this definition. Defendants argument is that under 702.17(g), the photograph of Nancy Doe with her top removed and her hair completely covering her breasts meets the definition of a prohibited sex act. No nudity, however, is present in Does photographs and her photos are exactly the type of material protected by the First Amendment. Therefore, Defendant's threatened prosecution is without merits and Plaintiffs are likely to prevail on the merits.

**C.     Plaintiffs Will Suffer Irreparable Harm to Their Constitutional Rights if a TRO is not Granted.**

The next factor for the Court to examine is whether the Plaintiffs will suffer irreparable harm if a TRO does not issue. Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d at 114. Even a temporary violation of First Amendment rights constitutes irreparable harm. Indeed, threat of prosecution has a chilling effect on the Plaintiffs expressing themselves by appearing in photographs, even

11

such innocent photographs as those in bathing suits. Irreparable harm also exists because Plaintiffs could not sue Defendant Bull if they were found not guilty after a prosecution, since he would be immune as prosecutor. Imbler v. Pachtman, 424 U.S. 409, 430 (1976).

Plaintiffs are not seeking monetary damages from the defendant. If they did, they would have an adequate remedy at law and the court would normally decline to provide equitable relief. See Franks GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) (finding that "[t]he availability of adequate monetary damages belies a claim of irreparable injury [and a] purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement."). Here, Plaintiffs seek the remedy of injunctive relief because Defendant Bull's actions abrogate their First Amendment rights. The United States Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976)).

For these reasons, Plaintiffs demonstrate a reasonable likelihood of success on the merits of their First Amendment claims, and have therefore demonstrated that they face irreparable harm from defendant's threatened actions. This factor too weighs in favor of this Honorable Court issuing a TRO to Plaintiffs.

**D.     No Harm Will Come to the Defendant, the Non-Moving Party, If a TRO is Issued.**

The third factor Courts must examine is harm to the non-moving party. <u>Dataphase Systems, Inc. v. C L Systems, Inc.,</u> 640 F.2d at 114. Here, no harm would come to the Defendant, the non-moving party, by delaying prosecution on this matter. Defendant himself has to this point refrained from the filing of any charges despite repeated threats, and thus does not appear to feel immediate prosecution is necessary to protect the public from the crimes that the girls here allegedly committed.

Therefore, Plaintiffs believe that the harm to the non-moving party is clearly insignificant and outweighed by the harm faced by the Plaintiffs from not granting the injunctive relief.

**E.     A TRO is in the Public Interest in this Matter.**

The final factor for the Court to examine in issuing a TRO is whether that TRO is the public interest. <u>Dataphase Systems, Inc. v. C L Systems, Inc.,</u> 640 F.2d at 114. "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the Plaintiff. Nonetheless, district courts should award preliminary injunctive relief only upon weighing all four factors." <u>AT&T v. Winback & Conserve Program</u>, 42 F.3d 1421, 1427 n.8 (3d Cir.1994). Plaintiffs believe that public interest would be protected by issuing the TRO since the public interest is served by enjoining a baseless prosecution brought in retaliation for the

13

exercise of constitutional rights. In fact, the public interest would be served by issuing a TRO in this matter as the public interest is on the side of protecting constitutional rights. This factor too, Plaintiffs believe, supports issuing a TRO.

## III. Conclusion

Wherefore, upon balancing the TRO factors, Plaintiffs believe that each factor weighs in favor of granting the TRO and therefore, accordingly, this Honorable Court should grant the Plaintiffs' motion for a temporary restraining order.

Friday, September 30, 2016

                                                Respectfully submitted,

*s/Glen S. Downey*
Glen S. Downey                       AT0012428

The Law Offices of Glen S. Downey, LLC
301 East Walnut St., Ste. 4
Des Moines, IA 50309
Tel: (515) 259-9571
Fax: (515) 259-7599
glen@downey-law.net

s/Robert G. Rehkemper
Robert G. Rehkemper        AT0006553

s/Matthew T. Lindholm
Matthew T. Lindholm        AT0004746

440 Fairway Drive, Suite 210

West Des Moines, Iowa 50266
Telephone: (515) 226-0500
Facsimile: (515) 244-2914
rgrehkemper@grllaw.com
mtlindholm@grllaw.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2016, I sent a copy of the foregoing document via email and First Class Mail to:

Ed Bull, Marion County Attorney
Marion County Courthouse
214 East Main Street
Knoxville, IA  50138
ebull@co.marion.ia.us